THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
FRANK CARUSO, Defendant-Appellant.

Second District   No. 2—89—0162

Opinion filed August 23, 1990.

Joseph M. Laraia and Kenneth D. Hubbard, both of Joseph M. Laraia & Associates, P.C., of Wheaton, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Frank Caruso III was charged with driving under the influence of alcohol, driving with a blood-alcohol concentration of .10 or more, and driving in the wrong lane. A jury found defendant not guilty of driving under the influence of alcohol but guilty of driving with a blood-alcohol concentration of .10 or more. The jury was unable to reach a verdict on the charge of driving in the wrong lane. Defendant was sentenced to one year's probation, alcohol counseling, and fined $500 plus court costs.

On appeal, defendant contends (1) the verdicts of not guilty for driving under the influence of alcohol and guilty for driving with a blood-alcohol concentration of .10 or more are legally inconsistent; (2) the State failed to lay a proper foundation for admission of the breath test result; and (3) the State failed to prove defendant guilty beyond a reasonable doubt. For the reasons stated below, we affirm.

The evidence adduced at trial is summarized as follows.

Police officer Steven Weatherford testified he was on duty traveling north on Route 83 on December 5, 1987, at approximately 12:21 a.m., when he saw defendant's car facing southbound in a northbound lane on Route 83. Route 83 had three lanes for through traffic and two left-turn lanes for each direction of traffic. Weatherford was stopped at the North Avenue light in the outside left-turn lane of Route 83, when he noticed defendant's car stopped at the light in the north, left-through lane of Route 83, facing southbound. He activated his lights and pulled his car in front of defendant's. When the light for the northbound through traffic turned green, the traffic in the left through lane merged to the center lane.

Weatherford approached defendant in his car and asked him what he was doing. Defendant responded that he was making a left turn. Weatherford detected a strong odor of alcoholic beverage coming from defendant's breath and noticed defendant's speech was slurred, his eyes were glassy and bloodshot, and his shirttail was untucked.

Defendant used both hands to pull himself out of the car. When defendant walked to the back of the car, Weatherford did not notice any physical problems; defendant was not limping. Weatherford asked defendant if he had been drinking, and defendant told him "he had a couple." When Weatherford asked defendant to perform some field-sobriety tests, specifically the walk-and-turn test and the one-legged-stand test, defendant responded that he could not do these tests because he had foot surgery on his right foot two weeks ago. Defendant said nothing about his knees at this time. Weatherford asked defendant to do the one-legged-stand test on his left foot. Defendant agreed and attempted the test, but he could only stand on this foot to a count of four instead of 30 as he was instructed. Believing that defendant was under the influence of alcohol, Weatherford placed defendant under arrest. On cross-examination, Weatherford stated he noticed nothing unusual about defendant's walking as he walked while handcuffed from the squad car to the station, a distance of 20 to 40 feet.

Officer Kveton testified he responded to the scene and observed defendant with Officer Weatherford. He believed defendant was under the influence of alcohol due to a somewhat strong odor of alcohol, slurred speech, glassy and bloodshot eyes, a belligerent attitude, and poor balance. On cross-examination, Kveton stated he could not remember whether defendant performed the walk-the-line test.

Officer Wanderer testified that he performed the breath test on defendant at the police station. He had administered over 1,000 breath tests, and he was familiar with the Department of Public Health (Department) standards for testing of alcohol in blood and breath. The court took judicial notice of the Department's standards. Wanderer received 40 hours of breath testing training in 1972 in compliance with the Department's standards. He passed the practical and written tests and was certified in 1972. He has been recertified every year and has been certified to use the Breathalyzer 2000 for six years. His police department uses the Smith and Wesson Breathalyzer 2000, which is approved by the Department of Public Health, and the machine is regularly tested. Two pages in the breathalyzer logbook had been filled out by a Department inspector who tested the machine. One page stated that two tests were run on the machine on November 13, 1987, using a .10 simulator, and both tests came out with .10 reading. On another page, the inspector wrote that on December 9, 1987, two tests were run with a .10 simulator and the tests came out with a .10 and a .09. The .09 reading, Wanderer testified, was in compliance with the Department standards, which allowed a variance for testing of .01. Along with the entries in the logbook, decals stating

that the machine was accurate and precise within the limits prescribed by the Department had been affixed to the logbook pages. The logbook entries and the decals were admitted into evidence over defendant's objection, though they have not been made a part of the appellate record.

In administering defendant's test, Wanderer testified he followed a checklist in compliance with Department standards. The checklist was admitted into evidence. Wanderer completed the top part of the checklist, filling in the date, the instrument's serial number, the name of the operator, and the name and driver's license number of the subject. The checklist contained the following six steps that were checked off by Wanderer.

"(1) Check to insure power switch is on.

(2) Observe subject for twenty minutes prior to testing to prevent any oral intake.

(3) Insert test record ticket.

(4) Press start/test. Wait for 'blow sample.'

(5) Take sample until 'analyzing' appears.

(6) When 'analysis complete' appears—remove test record ticket."

Wanderer stated he did not have to turn on the machine because it is kept on 24 hours a day. Before defendant took the test, Wanderer observed defendant for 23 minutes. During that time he did not see defendant put anything in his mouth; nor did he see him belch, vomit, or regurgitate. Wanderer then inserted the ticket into the machine and pushed a button. The machine took a sample of the room air and purged that sample to come up with a reading of .00. At this point, Wanderer believed the machine was operating properly. When the machine said "blow sample," he inserted a fresh mouthpiece and had defendant blow into the machine. The machine printed and displayed a reading of .18. The printout, which had defendant's name on it, was admitted into evidence.

Wanderer testified he also completed an arresting officer's checklist, which was admitted into evidence. Among other things, this checklist stated that the test was performed by an operator licensed by the Department of Health according to the Department of Health's/manufacturer's recommended testing procedures, and the instrument had been certified within 45 days of the date of the test as evidenced by a Department decal.

Defendant testified he had two vodka tonics from 6 to 7:30 p.m. Then, from approximately 8:30 to 11 p.m., he had three more vodka tonics at a restaurant. When he left the restaurant, he did not feel

the effects of the alcohol; he was driving fine. He did not drive south in the northbound lane on Route 83 at the North Avenue intersection. Rather, he was in the south, inside left-turn lane of Route 83, preparing to make a left turn.

Defendant told the officer who arrested him that he could not perform a one-legged-stand test because he just had surgery on his foot. He also told the officer he could not do the test on the other leg because he had knee problems. Defendant testified he had Reiter's syndrome, which caused atrophy in his leg and caused his leg to be unstable. He had knee surgery 10 months prior to the offense. Defendant testified the officer did not ask him to do the walk-and-turn test. He also testified that the other officer did not arrive to the scene until after he had been handcuffed.

Defendant's father and sister testified that defendant had knee problems due to Reiter's syndrome. They both saw defendant on December 5 at approximately 2 a.m., and they did not think he was under the influence of alcohol.

Richard Hall testified for defendant as an expert on the breathalyzer instrument. He is a retired village prosecutor and a chemist. As a prosecutor he became involved in studying and conducting experiments involving the testing of alcohol in blood and breath. He worked with the Department of Public Health to promulgate certification requirements for officers operating alcohol-testing instruments. He started the course for breath operators. He has been certified to operate breath-testing instruments and has administered over 1,500 tests. He has lectured and written articles on the subject of breath testing.

Hall stated that the requirement that the breath instrument be tested every 45 days does not insure the accuracy of the machine for those 45 days. He said the accuracy of the machine should be established by testing the machine for every test given to a motorist. He also stated that each motorist should be tested twice, not once, to obtain a reasonably accurate result. He stated it was quite common to have two tests show different results. The difference could be due to contamination caused by an unconscious belch, an upset stomach, or radio frequency interference. Also, there could simply be random error, where the machine temporarily malfunctions. Hall stated that the Smith and Wesson Breathalyzer 2000 can come very close to accurately identifying the concentration of alcohol if two room air tests and two breath tests are done for each subject.

Hall also stated that the test provides only, at best, an estimate of a person's blood-alcohol concentration because the machine fails to take into account four variables. First, the machine fails to account

for different partition ratios. Hall explained that the machine is set at a partition ratio of 2,100 to 1, meaning the machine assumes every person's breath will contain one twenty-one one-hundredths the quantity of alcohol that will be found in the blood. Hall said people have different ratios. The vast majority fall within a ratio of 1,900 to 1 to 2,300 to 1, though there are remote possibilities that people could be outside this range. Hall did not know defendant's partition ratio, but, assuming defendant's partition ratio was 1,900 to 1, his test result would have dropped from .18 to .163. Second, the machine fails to take the actual temperature of the sample; this failure can result in the test being off 6% to 7%. Third, the machine fails to account for the fact that people have different levels of water content in their blood. The machine functions on the erroneous assumption that everyone's blood has the same water content. Fourth, and most significant, the machine fails to account for the likelihood of contamination. The machine is based on the erroneous assumption that the alcohol air taken deep from the lung will remain unchanged as it comes up through the bronchial tree into the mouth and into the machine. Hall said contamination could cause the deep lung air to vary considerably from the air that enters the machine.

Hall concluded that a single test done on defendant could not determine with a reasonable degree of medical and scientific certainty that defendant's blood-alcohol concentration was over .10. Hall also testified that it was not possible to determine whether defendant had an alcohol concentration of .10 or more at the time he was driving his vehicle one hour prior to the test because one could not extrapolate with any reasonable degree of certainty.

The State, in rebuttal, offered the testimony of John Baker, who testified he was called to tow defendant's vehicle on December 5, 1987. When he got to the intersection of Route 83 and North Avenue, he saw defendant's vehicle in the northbound lane of Route 83 facing south with a squad car in front of the vehicle.

Defendant's first appellate contention is that the verdicts of not guilty of driving under the influence of alcohol under section 11—501(a)(2) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(2)) and guilty of driving with a blood-alcohol concentration of .10 under section 11—501(a)(1) of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501(a)(1)) are legally inconsistent.

■■ ■ Verdicts are legally inconsistent when a guilty verdict is premised on the existence of an element of the offense and a not guilty verdict is premised on the nonexistence of that same element. (*People v. Frias* (1983), 99 Ill. 2d 193, 198; *People v. Scherzer* (1989),

179 Ill. App. 3d 624, 648.) We do not agree with defendant's contention that the guilty verdict of driving with a blood-alcohol concentration of .10 or more is premised upon a finding that defendant drove under impairment, a necessary element of driving under the influence. The State need not prove impairment to prove a violation of section 11–501(a)(1). (*People v. Ziltz* (1983), 98 Ill. 2d 38, 42-43.) As stated in *People v. Ziltz*, when the State has proved that defendant operated a vehicle and his blood-alcohol concentration was over .10%, the statutory violations have been proved. (*Ziltz*, 98 Ill. 2d at 43.) On the other hand, the State need not prove defendant drove with a blood-alcohol concentration of .10 or more to prove that defendant drove under the influence of alcohol. (See *People v. Foley* (1987), 152 Ill. App. 3d 354, 357.) Thus, the verdicts are not legally inconsistent; the guilty verdict is not premised on the nonexistence of an element in the not guilty verdict. Finally, we note that the jury's decision not to convict on the driving under the influence charge in spite of the breath-test result of .18 could have been due to one of many factors, including compromise or an exercise of leniency, but this does not render the verdicts legally inconsistent. See *Foley*, 152 Ill. App. 3d at 357; *People v. Munday* (1985), 134 Ill. App. 3d 971, 975.

■ Defendant next contends the State failed to lay a proper foundation for admission of the result of the breath test. In *People v. Clark* (1989), 178 Ill. App. 3d 848, 855, this court noted the foundational requirements recently set out in *People v. Orth* (1988), 124 Ill. 2d 326, which include the following:

> "(1) evidence that the tests were performed according to the uniform standard adopted by the Illinois Department of Public Health, (2) evidence that the operator administering the tests was certified by the Department of Public Health, (3) evidence that the machine used was a model approved by the Department of Health, was tested regularly for accuracy, and was working properly, (4) evidence that the motorist was observed for the requisite 20 minutes prior to the test and, during this period, the motorist did not smoke, regurgitate, or drink, and (5) evidence that the results appearing on the 'printout' sheet can be identified as the tests given to the motorist." (*Orth*, 124 Ill. 2d at 340.)

Along with *Orth*, defendant cites *People v. Emrich* (1986), 113 Ill. 2d 343, contending that it holds that, to lay a proper foundation, the State must prove all the Department of Public Health's regulations as set out in sections 510.10 to 510.100 of the Illinois Administrative Code (77 Ill. Adm. Code, §§510.10 through 510.100 (1985)). Defendant

then proceeds to argue that the State failed to prove compliance with several of the regulations, including: (1) that the breath instrument was listed in the qualified products list of evidential breath measuring devices prepared by the National Highway Traffic Safety Administration of the United States Department of Transportation (77 Ill. Adm. Code §510.40(c) (1985)); (2) that defendant did not smoke for 20 minutes before taking the test (77 Ill. Adm. Code §510.60(a) (1985)); (3) that the test was performed according to the operational procedures as recommended by the manufacturer and approved by the Department (77 Ill. Adm. Code §510.60(d) (1985)); (4) that the operating procedures approved by the Department were posted at the instrument when defendant took the test (77 Ill. Adm. Code §510.60(d) (1985)); (5) that the breath-test operator's training consisted of a curriculum approved by the Department (77 Ill. Adm. Code §510.70(a)(4) (1985)); (6) that the operator passed the standard written examination provided by the Department (77 Ill. Adm. Code §510.70(b) (1985)); (7) that the operator passed a practical proficiency examination on the Breathalyzer 2000 (77 Ill. Adm. Code §510.70(b) (1985)); and (8) that the breath instrument was certified before it was initially placed into operation or after having been repaired (77 Ill. Adm. Code §510.100(b) (1985)).

We do not agree that the State must prove compliance with every Department regulation regarding breath-alcohol testing from sections 510.10 to 510.100 of title 77 of the Administrative Code (77 Ill. Adm. Code §§510.10 through 510.100 (1985)). The case cited by defendant, *People v. Emrich*, does not support this position. In *Emrich*, the court reiterated the language in section 11—501.2(a) which provides in relevant part:

"1. Chemical analyses of the person's blood, urine, breath or other bodily substance to be considered valid under the provisions of this Section shall have been performed according to standards promulgated by the Department of Public Health in consultation with the Department of State Police by an individual possessing a valid permit issued by that Department for this purpose." (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2.)

*Emrich* determined that a blood test was inadmissible against a defendant charged with driving under the influence because the State failed to follow a Department standard for blood tests that required blood tubes used in testing to contain an anticoagulant/preservative. (*Emrich*, 113 Ill. 2d at 351-52.) Thus, in *Emrich* the court held that one standard promulgated by the Department was not followed, and this violated section 11—501.2 (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501.2). We do not believe this holding can be read to state that a

proper foundation for blood or breath tests shall include proof of compliance with every regulation pertaining to testing in the Administrative Code. Section 11—501.2 does not state that this is required.

We believe *Orth* sets out all the elements required to lay a proper foundation, and we do not find that *Orth* requires proof of all the regulations on breath testing in the Administrative Code. In stating what was required to lay a proper foundation, *Orth* could have, if that was the court's intent, specifically required proof of all the regulations set out in the Administrative Code; however, it did not. Instead, *Orth* listed five factors. As we shall explain, proof of these five factors does not require proof of all the regulations regarding breath testing. Furthermore, we shall explain why we find the *Orth* factors were met in this case.

The first factor mentioned in *Orth* states that a foundation shall include evidence that the tests were performed according to the uniform standard adopted by the Department of Public Health. There are two possible interpretations to this factor. One is that it refers to the Department's regulations on operational standards (77 Ill. Adm. Code §510.60 (1985)), entitled "Standards for the Operation of Approved Breath Analysis Instruments," which requires the following:

"(a) Continuous observation of the subject for at least twenty (20) minutes prior to collection of the breath specimen, during which period the subject must not have ingested alcohol, food, drink, regurgitated, vomited or smoked.

(b) A breath test shall consist of only one (1) breath analysis.

(c) Before a breath analysis, a room-air analysis must be conducted, the results of which must be less than 0.01% reading.

(d) Each test shall be performed according to an operational procedure approved by the Department which shall be based upon the manufacturer's recommended testing procedure." (77 Adm. Code §510.60 (1985).)

The other possible interpretation is that *Orth* was referring only to the last requirement stated above, section 510.60(d), which requires that the test be performed according to a procedure approved by the Department based on the manufacturer's recommended procedure. We base this interpretation on the fact that *Orth* mentioned one of the factors listed above, section 510.60(a), the 20-minute observation period, as a separate factor. Since we believe the court did not intend to be redundant, we find the first factor in *Orth* only refers to section 510.60(d). Thus, the first factor under *Orth* requires proof that the

test was performed according to an operational procedure approved by the Department and based upon the manufacturer's recommended testing procedure. We note that in *Clark* this court held that where there was proof that the operator had followed a checklist that he had used for 16 years, but he did not know whether the checklist had been devised by the city or by the Department, and he did not testify that it was based on the manufacturer's recommended testing procedure, the test result was nonetheless admissible. (*Clark*, 178 Ill. App. 3d at 854.) By our opinion today, we do not intend to overrule *Clark*. We continue to recognize that, under some circumstances, as in *Clark*, where there was evidence that the test was administered according to the Department's procedure, and there was no evidence that the procedure followed was contrary to the recommended procedures of the Department or the manufacturer, the failure to offer proof that the procedure was according to the manufacturer's recommended procedure may not necessarily require exclusion of the breath test result. See *Clark*, 178 Ill. App. 3d at 854.

In the case at bar, we find the State offered sufficient proof to meet the first factor. Officer Wanderer testified that, in administering the test, he followed a checklist used by the police department that was in compliance with the Department of Public Health. Two checklists were admitted into evidence, an operational checklist and an arresting officer's checklist. The operational checklist consists of six steps that are all checked off in the appropriate space to indicate that the step was followed. The same is true of the arresting officer's checklist. The arresting officer's checklist states, among other things, that the test was performed according to the Department of Public Health's/manufacturer's recommended testing procedures. It also states that the instrument had been certified within 45 days, that the motorist was observed for 20 minutes prior to testing and did not ingest anything, did not regurgitate, vomit, smoke or put anything in his mouth, that a room air analysis resulted in a reading less than 0.01%, and that one complete test was given. We believe the officer's testimony and the checklists provide sufficient proof that the test was performed according to the standards adopted by the Department of Public Health based on the manufacturer's recommended procedures.

The second *Orth* factor requires evidence that the operator of the instrument is certified by the Department of Public Health. This factor is self-explanatory. Contrary to defendant's contention, we do not believe it requires the State to prove all the Department regulations in regard to licensing of an operator set forth in section 510.70 of the Administrative Code (77 Ill. Adm. Code §510.70 (1985)). Proof

of certification, unless there is evidence to show that the certification is not valid, is sufficient. In this case, the officer testified that he had been certified for 16 years and was presently certified when he administered the test. The officer's testimony is sufficient proof of his certification.

■ The third factor stated under *Orth* requires the State to prove three things: that the instrument used was a model approved by the Department of Health, was tested regularly for accuracy, and was working properly. Concerning the first requirement, section 510.40(b) lists several machines which have been approved by the Department (77 Ill. Adm. Code §510.40(b) (1985)). We believe the State can satisfy proof of this requirement with testimony that the machine is one listed in section 510.40(b). In this case, the court took judicial notice of the Department's regulations. The evidence showed that the instrument in this case was a Smith and Wesson Breathalyzer 2000. The Breathalyzer model 2000 is listed as one approved by the Department. (77 Ill. Adm. Code §510.40(b) (1985).) Thus, where the court took judicial notice of the regulations, there was sufficient proof that the instrument was approved by the Department.

The State must also show that the machine was regularly tested for accuracy. Section 510.100 explains that an instrument must be accurate within ± 0.01% W/V (weight of alcohol in the volume of breath) to be certified. (77 Ill. Adm. Code §510.100 (1985).) It also explains the procedure an inspector must take to inspect an instrument. We do not believe, however, that the State must prove these factors to lay a foundation. *Orth* stated only that the State must show that the machine was tested regularly for accuracy and was working properly. We find the State need show only that the instrument was inspected and certified within the time prescribed in section 510.100(a), which states that the machine must be tested at least once a month at intervals not to exceed 45 days. (77 Ill. Adm. Code §510.100(a) (1985).) As for the third requirement within this third factor, that the machine was working properly, we believe the State must show that it was certified within 45 days and that the machine did not exhibit any malfunctions at the time of the test.

The second and third elements of the third factor were met in this case where the logbook entries and decals indicated that the machine had been inspected within 45 days of the test date, and where Officer Wanderer testified that the machine had purged itself and was working properly.

■ The fourth *Orth* factor requires proof that the motorist was observed for 20 minutes prior to testing and did not smoke, regurgi-

tate, or drink during this period. The State must show that defendant did not ingest anything during the 20-minute period or regurgitate in any manner during this time. This factor was met in this case by Officer Wanderer's testimony that defendant put nothing in his mouth and did not belch, vomit, or regurgitate during the 20-minute period.

■ The fifth factor mentioned in *Orth* requires evidence that the results on the printout sheet can be identified as the test given defendant. This also is self-explanatory. We find Officer Wanderer's testimony and the printout sheet from the breathalyzer, which included defendant's name and the test result, sufficient proof of this factor.

■ In summary, the State has offered sufficient proof of the five factors set out in *Orth* to lay a foundation for a breath-test result; thus, we conclude that the court properly allowed admission of the defendant's breath test result.

■ ■ Defendant's final contention is that he was not proved guilty beyond a reasonable doubt. An appellate court will not reverse a defendant's conviction unless it is concluded that, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Defendant contends the testimony of his expert witness, who testified that a breath test cannot give an accurate determination of the defendant's blood-alcohol concentration at the time defendant was driving an hour earlier, establishes reasonable doubt of defendant's guilt. We disagree.

In *People v. Newman* (1987), 163 Ill. App. 3d 865, the court addressed this argument in a case with very similar circumstances. In *Newman*, the jury convicted defendant of driving with an alcohol concentration of .10 or more but acquitted defendant of driving under the influence of alcohol. In response to defendant's challenge that it was impossible to determine defendant's blood-alcohol concentration at the time he was stopped from where he took a breath test 30 minutes later, the court held that, despite the jury's acquittal on driving under the influence of alcohol, evidence of defendant's intoxication at the time of his arrest was relevant to the charge that he had an alcohol concentration of .10 or greater at that time. (*Newman*, 163 Ill. App. 3d at 868-69.) The court concluded that evidence that defendant drove erratically, had an odor of alcohol and glassy eyes, failed various field sobriety tests, and admitted drinking four alcoholic beverages on an empty stomach was sufficient to prove defendant had a blood-alcohol concentration of .10 at the time of arrest. (*Newman*, 163 Ill. App. 3d

at 868-69.) Likewise, in this case we find evidence that defendant's car was facing south in a northbound lane of traffic, that he had an odor of alcoholic beverage, slurred speech, and glassy eyes, and that he admitted drinking five vodka tonics during the evening was sufficient to prove defendant had a blood-alcohol concentration of .10 or more at the time he was stopped by the officer.

Finally, we are not persuaded that the jury could not have found defendant guilty because defendant's expert testified that the breath test was unreliable where, among other things, the operator did not take two samples of the air and two samples of the subject. A similar type of challenge was raised in *People v. Gustafson* (1990), 194 Ill. App. 3d 910, 922, where we recently stated that we would not substitute our judgment for that of the fact finder, which apparently rejected the scientific testimony presented by defendant.

The judgment of the circuit court is affirmed.

Affirmed.

McLAREN and REINHARD, JJ., concur.